UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

AIR LINE PILOTS ASSOCIATION,

                Plaintiff,

    - v. -

UNITED AIR LINES, INC.,

                Defendant.

------------------------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ SEP 2 6 2011 ★

BROOKLYN OFFICE

Case No.

**CV 11 - 4661**

**JOHNSON, J**

## COMPLAINT FOR IMMEDIATE
## INJUNCTIVE RELIEF UNDER THE RAILWAY LABOR ACT

**GOLD, M.J.**

Plaintiff Air Line Pilots Association ("ALPA"), through its attorneys, Cohen,

Weiss and Simon LLP, for its complaint against United Air Lines, Inc. ("United" or "the

Company") for injunctive relief, a declaratory judgment, and other appropriate relief, under the

Railway Labor Act ("RLA"), 45 U.S.C. §§ 151-188, in order to preserve, pending arbitration

proceedings, the jurisdiction of the mandatory arbitration panel established by the parties as the

United Pilots System Board of Adjustment ("System Board"), states as follows:

### INTRODUCTION

      1.      On September 30, 2011, United will significantly change a host of flight

operations procedures as it seeks to complete its operational merger with Continental Air Lines,

Inc. ("Continental"). United has failed to effectively or adequately train its pilots in the new

procedures and it has refused ALPA's repeated requests that it extend its self-imposed

September 30 deadline for implementing the procedures to enable the United pilots to be

adequately trained. Because of the risk to the jurisdiction of the System Board and the even

more important risk flight safety should United implement the new procedures before it

effectively trains pilots for those procedures, ALPA brings this action to stay United from implementing the revised procedures pending the resolution of a contract grievance under their collective bargaining agreement ("CBA" or "Agreement") concerning this critical training issue.

2.     ALPA's contract grievance challenges United's unilateral training decisions, based on the contractual requirement that disputes over changes in training be *resolved* by ALPA and United and *not* unilaterally dictated by management. ALPA has requested that United mandate classroom instruction and training on appropriate devices in connection with the operation changes that are covered in Phase II of the training for new procedures. United has failed and refused to resolve the dispute with ALPA. United pilots who have gone through the training for these new procedures report, and ALPA's analysis confirms, that the amount and quality of the training is simply inadequate to absorb the new procedures and make them part of the pilots' instinctual coordinated operating practices. The resulting distractions and lack of coordination pose serious risks to flight safety in a challenging environment that cannot, and should not be, tolerated. ALPA has proposed changes to training that, if they are to be effective to deal with the safety risks, *must* take place before United implements the new procedures, not after, when an accident or incident may result. ALPA has requested both that the Company agree to stay implementation of the Phase II changes pending the decision of a labor arbitrator and to schedule an arbitration hearing on an expedited basis. United's refusal to so agree has necessitated this action.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action under 28 U.S.C. §§1331, 1337, 2201, and 2202 as the action arises under the Railway Labor Act ("RLA"), 45 U.S.C. §§151-188. This Court has jurisdiction under the RLA to issue the injunctive relief sought by Plaintiff.

- 2 -

4.      Venue is proper in this District under 28 U.S.C. §1391(b) and (c) because

United does business in this judicial district and United pilots are based in this judicial district.

## STATEMENT OF FACTS

The Parties

5.      ALPA is an unincorporated labor organization and is a "representative" as

defined in Section 1, Sixth of the RLA, 45 U.S.C. §151, Sixth. ALPA is the collective

bargaining representative under the RLA for all airline pilots employed by the United. ALPA

represents the United pilots through a coordinating council comprised of elected pilot

representatives, the United Master Executive Council ("United MEC").

6.      United is a "common carrier by air engaged in interstate and foreign

commerce" as defined in Section 201 of the RLA, 45 U.S.C. §181. United is now, and at all

material times has been, a wholly-owned subsidiary of United Continental Holdings, Inc., a

public corporation and successor to UAL Corporation. On information and belief, United is a

corporation authorized to do business and doing business in the Eastern District of New York

with flight operations through major commercial airports and pilots based in this judicial district.

United is also, and at all times material to this action has been an "air carrier" as that term is

defined in 49 U.S.C. § 40102(a)(2).

The Collective Bargaining Agreement

7.      ALPA and United have been parties to a series of collective bargaining

agreements over many years establishing terms and conditions of pilot employment. The present

CBA was negotiated in 2003 and modified in 2005, and became amendable on December 31,

2009, but remains in effect in accordance with the Railway Labor Act.

8.      Section 9 of the CBA provides for ALPA involvement in an iterative

process concerning pilot training. In particular, Section 9-G-1-a of the Agreement states:

- 3 -

The Company shall establish such training policies as are necessary to insure compliance with this Agreement and to accomplish the necessary training requirements of the Company. A Training Committee composed of representatives of the Company and representatives of the pilots shall be established. The Training Committee shall meet quarterly unless the parties agree to meet less frequently, or at any other time the parties mutually agree. It is the intent of the parties to this Agreement that this Training Committee shall provide the pilots with the opportunity to consult with and make recommendations to the Company on training policies or changes, training programs or changes, or any other matters affecting pilot training. In the event that the Training Committee and the Company are unable to resolve issues of training, these issues will be referred to the Vice President of Training, the Senior Vice President of Flight Operations and the Master Chairman for resolution.

The United-Continental Merger

9.      In May 2010 United announced that it would merge with Continental, whose pilots are also represented by ALPA through a separate MEC. One part of the process of merging the two airlines is combining their operations under a single operating certificate ("SOC") to be issued by the Federal Aviation Administration ("FAA").

10.     United has targeted November 11, 2011 as the date by which it would have the FAA approve operations of pre-merger United and pre-merger Continental on a single operating certificate.

SOC Training Phases and Associated Deadlines

11.     United and Continental operate two types of aircraft in common: Boeing B-757/767 and B-777 aircraft. (Pilots who are qualified to operate the B-757 may also fly the B-767 and vice versa). To get to the point where pre-merger Continental and pre-merger United pilots may operate together in the same cockpit, it is necessary to have one set of operating procedures contained in aircraft specific Flight Manuals for each aircraft type as well as a common Flight Operations Manual applicable to all flight operations. This is a difficult and

- 4 -

time-consuming task because all airlines over time develop unique flight operations standards and procedures.

12.     With respect to the common aircraft, management developed a five phase SOC training program to transition pilots to common flight operations standards and procedures: Phase 0 served as an introduction to the process and was introduced in April 2011; Phase I concerned non-normal flight situations, including, for example, situations involving rapid depressurization and emergency descents and became effective July 22, 2011; Phase II concerns all elements of flight from cruise through landing and taxiing to the conclusion of flight operations at the gate, and pilots must have completed training by September 23, with the modifications to take effect on September 30; Phase III covers operations from take-off to cruising altitude and are scheduled to become effective in part in October 2011 and the first quarter of 2012; Phase IV concerns information technology issues as they related to integration of other working groups with flight operations, *e.g.*, integration of load planning procedures with flight operations.

13.     United made a decision to adopt baseline Continental Standard Operating Procedures for the B-757/B-767 fleet and B-777 fleet. Thus pre-merger United pilots on the common aircraft types are being required to adapt to what are for the most part Continental procedures. ALPA does not object to such procedures but has informed United that its training program United pilots for these extensive changes is not adequate.

14.     Phase II training for United pilots as prescribed by the Company consists of computer-based learning modules, one covering general subjects and one covering issues specific to each aircraft type, that management initially stated would take pilots one hour to complete in total. The fleet-specific module highlights changes to flight procedures covered by

Phase II and includes a self-testing component. The Phase II curriculum included no classroom instruction or use of training devices, such as cockpit mock-ups, fixed-base or full motion flight simulators.

15.     In addition to the computer modules, the Company has produced an optional Pilot Merger Guide ("PMG") for both the B-757/767 and B-777 for each phase of training. The PMG highlighting changes to operations covered in Phase II runs to approximately 100 pages for both aircraft types.

16.     ALPA had only limited involvement with United management in the design of Phase II training. While ALPA had input with respect to the changes to be made in Phases I and II, ALPA had minimal input on how these changed would be trained. After repeated ALPA requests, on July 20, 2011, the Company finally permitted ALPA to designate subject matter experts ("SME's") to participate in the SOC training development process.

17.     Once the SME's became involved in the process, ALPA finally understood the magnitude of procedural changes that the United pilots would undergo in Phase II. It was thus not until that time that ALPA realized that adequate training for such complex changes *must* involve mandatory classroom time, or the pilots would simply not be able to absorb the changes and make them part of their instinctual operating behavior.

18.     By that time, however, the Company had made the decision to utilize solely computer-based training for Phase II, and management repeatedly rebuffed ALPA's subsequent entreaties to provide mandatory classroom training.

Pilot Training At Pre-Merger United and Continental

19.     United has long placed heavy reliance on adherence to well-defined standard operating procedures ("SOPs") for both normal flight operations and emergency conditions where aircraft systems malfunctions are encountered which has generate a distinctive

- 6 -

culture of flight training.  United has developed detailed operating procedures, checklists, and

flight manual sections for all flight operations.  These SOPs span across all aircraft types at

United, creating a culture where all pilots perform operating procedures in strict adherence to

SOPs.  This results in a high degree of standardization across crews and aircraft types.  United

regarded such standardization is necessary for cockpit crew who often come together to operate

the aircraft without ever having flown together other before.

          20.     The move to SOPs more in line with pre-merger Continental was based on

an entirely different approach.  The new procedures place a focus on stabilizing the aircraft in a

non-prescriptive fashion when faced with non-normal operating conditions which gives great

latitude to the individual pilot using his or her airmanship skills.  This is a fundamental change in

to managing in flight emergencies, and, while ALPA does not object to such changes, the fact is

that they require *major* training for the United pilots transitioning to this new approach.  On top

of this philosophical change, Phase II covers a high number of changes in flight procedures with

significant flight safety implications.

Flight Manual Revisions

          21.     A central part of Phase II involves a substantial revision to United's Flight

Operations Manual as well as its Flight Manuals.  United completely reorganized these critical

manuals.  The Flight Manuals were originally organized into thirty-one chapters; the revisions

are now limited to six chapters and there have been a significant number of substantive revisions.

Materials located in the Flight Operations Manual have been relocated to the Flight Manuals and

vice versa.  As United stated in the Phase II PMG, "content was added, retitled, split, combined

and deleted" from the Flight Manuals.

          22.     Because the revised Flight Manual does not highlight the changes (and

could not because they are so numerous), pilots must review the entire manual to learn its

- 7 -

contents. This has been further complicated because the Company has revised the Flight Manuals during the Phase II training period. The initial draft flight manual for the B-757/767 was 802 pages; a revised flight manual, as approved by the FAA, was issued at the conclusion of the time United management allotted for completion of Phase II training. The approved B-757/767 manual is more than 1,300 pages. The extent of the modifications to the Flight Operations Manual is unprecedented at United.

Phase II Changes to Standard Operating Procedures

      23.    Included in Phase II are modifications to a number of SOPs and procedural flows. SOPs and flows are steps in a flight process that the crew must follow associated with a certain stage of the flight. Duties are divided between the pilot flying the aircraft and the pilot monitoring the flight, or between the Captain and First Officer. Proper execution of the procedure requires coordination between flight crew members as each manipulates the aircraft's controls.

      24.    Additionally, United modified a number of flight profiles. A flight profile is a series of recommended aircraft configurations at particular points in space and an associated flight maneuver. It relocated, modified, or deleted the descriptions of a number of the components of flight profiles, resulting in changes to the manipulation of the auto-flight system and how and when the aircraft configuration is changed.

      25.    Classroom training and appropriate training devices for all the many modifications described above is of great importance, because learning a revised protocol requires both cognitive and motor skills. Mastery of these routines by both flight crew members is essential because they involve coordinated functions which must become routine and habitual to minimize risk. Control of an advanced aircraft requires that the crew perform a multitude of tasks in the face of evolving circumstances and threats, such as adverse weather or air traffic

- 8 -

control decisions. If one crew member is unable to properly execute any of the required steps in the procedure, both crew members may become distracted, which increases the likelihood of errors.

26.     United has also modified a number of callouts. Callouts are methods by which the pilot flying the aircraft will command the pilot monitoring to make modifications to aircraft configurations. Callouts are also used by the pilot monitoring to prompt the pilot flying to become aware of various conditions during flight. Clear callouts encourage effective flight management and rapid error correction. An additional change is the conversion to a Quiet Cockpit concept that reduces the number of callouts at certain points in the flight, another instance of a philosophical change in flight deck management that requires classroom instruction.

The Risk to Safety Presented by Insufficient Training

27.     When changes to SOPs such as those outlined above are not properly trained and learned, the possibility that the flight crew will become distracted and make errors increases, presenting significant risks to safety. The possibilities for distraction are magnified here because of the substantial nature of changes to SOPs in non-normal flight circumstances already made in Phase I.

28.     Management recognizes this, but is unwilling to act on this recognition. As the PMG for Phase II training on the B-757/767 notes, "[i]nterruptions and distractions are frequent threats facing flight crews and have been shown to lead to significant safety problems."

29.     In this regard the Company's Phase II PMG noted that while distractions "can be minimized or eliminated through training, adoption of effective procedures, discipline and the use of good judgment[,] [i]f the number of interruptions and distractions is not minimized or the impact of residual interruptions and distractions is not controlled, flight safety

- 9 -

can be affected. In particular, when a flight crew is disturbed while monitoring or controlling the aircraft, errors can occur and go undetected." "The omission of a required action or an inappropriate action is the most frequent causal factor in incidents and accidents[.]"

Pilot Reports Concerning SOC Training

30.     United pilots have recognized the enhanced risks associated with the limited training United has required for Phase II. Recent pilot safety reports and incident investigations identify a disturbing increase in pilot errors at United. The changes to the procedures and the philosophical approach to cockpit and emergency management associated with SOC integration have significantly increased the pressure on the pilots, further amplifying the ALPA's concern. Pilot reports clearly have expressed that the current level of training for SOC is inadequate.

31.     Before this transition training, pilot concerns with the content or efficacy of pilot training have been relatively rare. Now, however, pilots are filing hundreds of reports concerning Phase I or Phase II training, reports that focus on both the adequacy and efficacy of the training that has been offered. A number of pilots have questioned whether they can safely fly even after completing the prescribed training curriculum. Pilots have reported being overwhelmed with the number of changes and unprepared by the minimal training offered.

The Section 9-G-1-a Process

32.     ALPA has sought to engage United to augment the computer-based training and to extend the September 30, 2011 deadline for Phase II training to accomplish that goal.

33.     On September 6, 2011, UAL MEC Chairman Captain Wendy J. Morse sent a letter to the Company invoking Section 9-G-1-a of the Agreement and requesting an immediate meeting of the bilateral Training Committee described in that provision. In the letter

- 10 -

ALPA requested the meeting to resolve SOC training issues concerning the Phase II training and implementation date. ALPA sought to have the Company defer implementation of the September 30, 2011 Phase II implementation date "until such time as all B-777 and B-767-757 crews are provided adequate training to permit them to operate safely under the new procedures, including appropriate mandatory standup and classroom training with cockpit panels to be completed prior to the implementation of SOC Phase II procedures." The bilateral Training Committee also was to resolve the inadequacy of the present Phase II training and to determine whether such training requires negotiation of a separate letter of agreement.

34.     Captain Morse's letter noted that feedback to ALPA from pilots on the line revealed that the training was taking six to eight hours rather than the one hour scheduled by the Company and that mandatory standup and classroom training with cockpit panels "is a minimum necessary to adequately learn and absorb the new procedures – *before* the procedures are implemented on the line."

35.     On September 9, 2011, pursuant to the provisions of Section 9-G-1-a, ALPA representatives met with representatives of the Company to make ALPA's concerns as to this training known, to present recommended changes and to request that the Phase II completion and implementation dates be delayed until such time as the pilots are fully and adequately trained in the new procedures.

36.     On September 11, 2011 the Company advised ALPA that it would make only limited changes in response to the request and would not delay either the completion or implementation dates. The Company refused to delay the implementation date of the Phase II training and declined to provide mandatory classroom training prior to implementation.

- 11 -

37. On September 21, 2011, as further required by Section 9-G-1-a, Captain Morse held a telephonic meeting with the Senior Vice President of Flight Operations, Fred Abbott, and the Vice President of Training, Keith Rimer, for the purpose of resolving the Phase II training issues. The meeting lasted fewer than thirty minutes. Captain Morse emphasized in the meeting that to resolve the training issue, the Company must provide mandatory standup and classroom training with cockpit panels to be completed *prior* to the implementation of SOC Phase II procedures, and that if this necessitated a delay in the September 30, 2011 implementation date, then such a delay was necessary.

38. At the conclusion of the meeting Mr. Abbott said that the Company would neither make any further changes to the training as constructed nor delay the completion or implementation dates. Captain Morse then informed the Company that ALPA would immediately grieve the failure by the Company to resolve these issues and asked: (a) that the Company waive the requirement for the two pre-arbitration hearings provided by Section 17-A of the Agreement, (b) that it proceed immediately to an expedited arbitration before the United Pilots System Board of Adjustment (our Company-Union arbitration panel), and (c) that it agree to delay the completion and implementation dates pending the outcome of that proceeding to enable the System Board to render a meaningful decision. The Company refused to agree to *any* of these requests.

39. On September 22, 2011, ALPA filed a grievance with the Company under Section 9-G-1-a. ALPA then again requested that the Company waive the initial and appeal hearings provided in Section 17-A of the Agreement, that it agree to a Neutral Chairman and an expedited arbitration before the United Pilots System Board of Adjustment, and that it agree to

- 12 -

delay the completion and implementation dates pending the outcome of this proceeding. The Company has not agreed to any these requests.

40.     ALPA's position concerning the grievance is that the Company violated Section 9-G-1-a of the Agreement when it failed to resolve the ALPA's issues with respect to Phase II SOC training as it is currently designed and implemented. The grievance seeks the following relief from the System Board: (a) that the Company be ordered to resolve the ALPA's issues with respect to the Phase II SOC training; (b) that the Company be ordered to delay the required completion and implementation dates until the ALPA's issues with Phase II SOC training are resolved and the pilots are given such time as necessary to complete the new training syllabus, and (c) any and all other and further relief available under the Agreement.

41.     ALPA has complied with every legal obligation imposed by law in connection with this dispute.

42.     No prior application has been made for the relief sought herein.

## CAUSE OF ACTION -- RLA MINOR DISPUTE INJUNCTION

43.     ALPA repeats and realleges paragraphs 1-42 above as though fully set forth herein.

44.     United has triggered a minor dispute that must be resolved in arbitration before the United Pilots System Board of Adjustment pursuant to Section 204 of the RLA, 45 U.S.C. § 184.

45.     In cases involving minor disputes under the RLA, courts may issue injunctions to preserve the jurisdiction of the System Board when the absence of an injunction the System Board will be deprived of its ability to provide an adequate remedy.

46.     United's unilateral implementation of Phase II SOC changes prior to the contractually-required resolution of the issues of training and prior to affording the pilots the

- 13 -

necessary time to complete the newly resolved training syllabus will cause substantial and irreparable harm to ALPA and the United pilots, and will deprive the System Board of its ability to provide any adequate remedy.

47.     An injunction therefore is warranted requiring United to cease and desist from implementing the revised procedures covered by Phase II SOC training pending a System Board decision on ALPA's pending grievance under Section 9-G-1-a of the parties' collective bargaining agreement.

- 14 -

## PRAYER FOR RELIEF

WHEREFORE, ALPA respectfully requests that this Court issue:

A.     A t preliminary injunction, to be made permanent upon the conclusion of the trial in this action (should a trial be necessary), enjoining and prohibiting United, its directors, officers, agents and employees, from implementing any and all revised procedures covered by Phase II SOC training pending a United Pilots System Board of Adjustment decision on ALPA's pending grievance under Section 9-G-1-a of the parties' collective bargaining agreement; and

B.     A judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring the rights of the parties; and

C.     Granting such other and further relief as is just and proper, including reasonable attorney's fees and the costs and disbursements of this proceeding.

Dated:     September 26, 2011

Michael E. Abram
Thomas N. Ciantra
Evan Hudson-Plush
COHEN, WEISS AND SIMON LLP
330 West 42nd Street, 25th Floor
New York, New York 10036
Telephone:  (212) 563-4100
Facsimile:  (212) 695-5436

*Attorneys for Plaintiff*
*Air Line Pilots Association*